**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ANITA MUNETA,                                  )
                                               )
              Plaintiff,                       )
                                               )
vs.                                            )          No. CIV 03-1102 RB/RHS
                                               )
MICHAEL O. LEAVITT, Secretary of              )
the Department of the Health and Human        )
Services Agency,                              )
                                               )
              Defendant.                        )

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** came before the Court on Defendant's Motion for Summary Judgment (Doc. 40),

filed on November 7, 2005.  Jurisdiction arises under 28 U.S.C. § 1331 (1980) and 42 U.S.C. § 2000e-

16(c) (2004).  Having considered the submissions, and being otherwise fully advised, I hereby deny

Defendant's motion as to Plaintiff's discrimination claim, *see infra* Part IV.A., but grant the motion as to

Plaintiff's retaliation claim, *see infra* Part IV.B., as follows.

**I.      Background.**

        Except as otherwise noted, the following facts are undisputed or construed in Plaintiff's favor.  *See*

*E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1189 (10th Cir. 2000) (disputed facts

construed in favor of the party opposing summary judgment).  Plaintiff, a Native American woman, is

employed by Defendant (Michael O. Leavitt, Secretary of the United States Department of Health and

Human Services) at the Navajo Area Indian Health Service [hereinafter "IHS"].  (Compl. at 2-3 (IHS is an

1

agency within the Department of Health and Human Services).)

Plaintiff's employment history with Defendant is set forth, in applicable part, as follows. Since 1987, Plaintiff has worked as CEO of the IHS Crownpoint Service Unit in Crownpoint, New Mexico. (Def.'s Mem. Mot. Summ. J. Ex. B. at 7:18-23 (Plaintiff became a GS-14 level federal employee in 1988).) Plaintiff's direct supervisor is Navajo Area IHS Director John Hubbard. (Def.'s Mem. Mot. Summ. J. Ex. A at 1.) Don Davis, who works for IHS in Rockville, Maryland, supervises Hubbard. (*Id.* at 6.)

On October 21, 1996, Plaintiff filed an Equal Employment Opportunity [hereinafter "EEO"] Complaint against Hubbard. (Compl. Ex. (Final Agency Decision regarding Plaintiff's 1996 EEO Complaint).) Defendant issued a Final Agency Decision, denying her complaint, on May 16, 1997. (Pl.'s Resp. at 1.) Plaintiff did not appeal the agency's decision. (*Id.*)

According to Defendant, "[e]arly in 1998," Hubbard "began to have concerns about [Plaintiff's] use of leave." (Def.'s Mem. Mot. Summ. J. Ex. A6 at 1, Ex. A9 (raising concerns regarding Plaintiff's "year-ending balances for annual, sick and compensatory leave" for the previous "few years").) By memorandum of May 22, 1998, Hubbard communicated his concern to Plaintiff regarding her "constant changes and revisions" to her leave requests because "it add[ed] to the administrative task of resubmitting forms and reapproving them." (Def.'s Mem. Mot. Summ. J. Ex. A7.)

Sometime later, Hubbard asked Defendant's Albuquerque, New Mexico office to conduct an Internal Affairs Branch ["IAB"] audit of Plaintiff's time, attendance and leave records for 1996 and 1997. (Def.'s Mem. Mot. Summ. J. Ex. A6 at 1 (IAB, independently, expanded the audit to include Plaintiff's 1994-1995 leave records).) It is, however, unclear *when* Hubbard initially requested the IAB audit. (*Compare* Pl.'s Resp. at 2, *with* Def.'s Mem. Mot. Summ. J. at 3.) According to Plaintiff, Hubbard initiated the audit in fall 1997. (Pl.'s Resp. at 2; *see* Def.'s Mem. Mot. Summ. J. Ex. A8.) In any event, Hubbard

received the first report from IAB in September 1998 (Def.'s Mem. Mot. Summ. J. Ex. A10 at 1), which indicated that Plaintiff had a negative annual leave balance and had failed to properly account for her time and attendance.[1]  (Def.'s Mem. Mot. Summ. J. Ex. A6.)

Ten months later, on July 30, 1999, Hubbard informed Plaintiff that she: (1) had received an "unacceptable" rating on her fiscal year [hereinafter "FY"] 1998 performance evaluation; and (2) would be placed on a Performance Improvement Plan [hereinafter "PIP"] immediately.  (IPTR at 2.)  Defendant explained that Plaintiff's "unacceptable" performance rating was attributed exclusively to "Critical Job Element #1" - that is, "balancing the overall service unit financial resources."  (Def.'s Mem. Mot. Summ. J. Ex. A2 at 1-2.)  Service Unit CEOs are expected "to make every attempt to remain within their allotted budgets without relying" on supplemental, reserve funds.  (*Id*. at 2.)  At the same time, however, Defendant conceded that "periodically" the "Area Office provides additional funds to Service Units."  (*Id*.)   I t   i s uncontested that Plaintiff's Service Unit reported a surplus of $131,000 for FY 1998.  (IPTR at 3, 4.)  But the Crownpoint Service Unit budget included "non-recurring funds" from the Navajo Area IHS Office Reserve.[2]  (Def.'s Mem. Mot. Summ. J. Ex. A2 at 1.)  According to Defendant, the Plaintiff would have reported a significant deficit for FY 1998 had she not received "a transfer of funds and other line item transfers" of reserve funds.  (IPTR at 4; Def.'s Mem. Mot. Summ. J. Ex. A1 at 2 ("without area office support . . . Crownpoint would have ended up with a deficit of $754,900").)  Defendant also maintained that, on July 30, 1999 "for a second year in a row," Crownpoint Service Unit projected a budget deficit and

---

[1] IAB's final audit reported that Plaintiff "had a (negative) balance of - 107 hours of annual leave and 26 hours of sick leave" for the period between 1994 and March 13, 1999.  (Def.'s Mem. Mot. Summ. J. Ex. A6, Ex. A10 ("IAB discovered serious timekeeping procedural problems.").)

[2] The Navajo Area IHS Reserve refers to funds available to Hubbard, "as the Area Director," that "are set aside each year for potential emergencies."  (Def.'s Mem. Summ. J. Ex. A at 2.)

that Plaintiff "failed to take appropriate actions to eliminate the deficit." (*Compare* Def.'s Mem. Mot. Summ. J. Ex. A ¶6 (stating that projected deficit exceeded "$2M"), *with* Def.'s Mem. Mot. Summ. J. Ex. A2 at 2 (conceding that the "June 3, 1999" deficit reduction plan reduced the projected shortfall to $450,000).) Having received an "unacceptable" rating on one critical element, Plaintiff's *overall* job performance rating for FY 1998 was, *ipso facto*, "unacceptable," as well. (Def.'s Mem. Mot. Summ. J. Ex. A2 at 1.) Hubbard also decided to place Plaintiff on a PIP "due to her unacceptable performance." (*Id*.) The PIP, Hubbard explained, would "provide [Plaintiff] additional assistance and guidance to help [her] improve [her] performance." (*Id*.)

On July 30, 1999 - that is, the same day Hubbard gave Plaintiff the "unacceptable" performance rating and placed her on a PIP - Hubbard informed Plaintiff that he had recommended to Davis that she be suspended for twenty-eight days. (Def.'s Mem. Mot. Summ. J. Ex. A6 at 1.) Hubbard stated that he premised his recommendation on two bases: (1) Plaintiff's "time and attendance problems"; and (2) her unlawful transportation of her son, an "unauthorized" passenger, in a government vehicle on April 26 and April 29, 1999. (*Id*. at 1-3.) Plaintiff requested EEO counseling regarding the proposed suspension on April 10, 1999. (IPTR at 2.) She filed an EEO Complaint on October 22, 1999. (*Id*.)

In December 1999, Defendant suspended Plaintiff for fourteen days (December 12-25, 1999). (*Id*.) Davis issued the final suspension order "based on" Hubbard's July 30, 1999 "notice of proposed suspension," as well as Davis' own "evaluation." (*See id*. at 5; Def.'s Mem. Mot. Summ. J. at 4 (noting that, in evaluating Hubbard's proposed suspension, Davis "received both oral and written communications from [Plaintiff]").) Davis premised the suspension on the same two bases recommended by Hubbard. (Def.'s Mem. Mot. Summ. J. Ex. A12 at 1-2.) Notably, however, Davis decided to reduce the proposed "twenty-eight (28) calendar day suspension to fourteen (14) calendar days" given:

4

[Plaintiff's] thirteen years of service, the performance awards . . . [she] earned as stated in the proposal letter and the fact that . . . [Plaintiff] had no prior disciplinary actions against [her].[3]

(*Id.* at 2 ("I believe that a seven-day suspension for each sustained charge to be the appropriate disciplinary action.").)  Plaintiff filed a grievance as to her suspension on January 26, 2000.[4]  (Pl.'s Resp. at 4.)

In February 2000, Hubbard removed Plaintiff from the PIP.  (Def.'s Mem. Mot. Summ. J. Ex. A4 at 1 (Plaintiff earned an "acceptable" rating on Critical Element #1 for FY 1999).)  Hubbard stated that Plaintiff's FY 1998 performance rating would "remain as unacceptable," but that she would not be subject to "additional action . . . based on the unacceptable rating." (*Id.*)  At the same time, Hubbard stated that if Plaintiff failed to "maintain an acceptable level of performance in [Critical Element #1]" through July 29, 2000 further action could be taken against her, including "a reduction-in-grade or removal." (*Id*; Def.'s Mem. Mot. Summ. J. Ex. A3 at 1.)

Fifteen months later, on March 23, 2001, Defendant issued a Final Agency Decision dismissing Plaintiff's 1999 EEO Complaint.  Plaintiff appealed that ruling to the Equal Employment Opportunity Commission [hereinafter "EEOC"].  EEOC affirmed Defendant's decision, in its entirety, on August 7, 2002.  On June 17, 2003, EEOC denied Plaintiff's request for reconsideration. Plaintiff timely filed the Complaint in the instant proceeding on September 19, 2003.  (Compl. Ex. (EEOC decision of 6/17/03)

---

[3]Hubbard gave Plaintiff "outstanding" performance evaluations for FY 1995, FY 1996, and FY 1997. (Def.'s Mem. Mot. Summ. J. Ex. A12, A6 at 4 (noting that Plaintiff had received roughly "ten different performance awards during" her tenure).)  Likewise, Hubbard assessed Plaintiff's performance, under a new two-tier evaluation system, as "acceptable" in May 2000.  (Def.'s Mem. Mot. Summ. J. at 3 (two-tier system replaced five-tier system).)

[4]Plaintiff did not maintain that the grievance she filed in January 2000 constituted a discreet instance of "protected" activity.  In any event, it clearly could not support a prima facie claim of retaliation because Hubbard proposed the suspension in July 1999, which Davis imposed in December 1999.  *See Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1263 (10th Cir. 1998) (plaintiff must allege that employer took "adverse employment action" either "contemporaneously or shortly after" plaintiff engaged in protected activity).

(authorizing Plaintiff to file a judicial complaint within 90 days).)

## II.   Summary Judgment Standard.

Pursuant to FED. R. CIV. P. 56(c) summary judgment "is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (quoting FED. R. CIV. P. 56(c)). Thus, the Court must analyze the "factual record and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *See id.*

The moving party shoulders "the initial burden to show that there is an absence of evidence to support the nonmoving party's case." *Id.* (internal quotation marks and citations omitted). If Defendant, the moving party here, satisfies this burden, Plaintiff must "identify specific facts that show the existence of a genuine issue of material fact." *See id.* ("party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor."). A "fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1190.

An otherwise well-taken summary judgment motion is not, however, defeated by the "mere existence of *some* alleged factual dispute between the parties . . . the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis added). On appeal, a district court's order granting summary judgment is reviewed *de novo. See McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1107 (10th Cir. 2002).

## III.   Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

Title VII makes it unlawful for an employer to discriminate against any individual with respect to

the compensation, terms, conditions, or privileges of employment on the basis of race or gender. *See* 42

U.S.C. § 2000e-2(a)(1) (1991); *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1306 (10th Cir.

2005) ("To prevail on a disparate treatment claim under Title VII, a plaintiff must show that his employer

intentionally discriminated against him for a reason prohibited by the statute."). Retaliation against an

employee who engages in protected Title VII activity is also proscribed under the Act. *See* 42 U.S.C. §

2000e-3(a) (1972).

Pursuant to Title VII, a plaintiff must establish intentional discrimination or retaliation through

"either direct or indirect evidence." *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)

(gender discrimination); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226-27 (10th Cir. 2000)

(race discrimination); *Miller v. Auto. Club of New Mexico, Inc.*, 420 F.3d 1098, 1120 (10th Cir. 2005)

(retaliation). Because the record contains no direct evidence that Defendant violated Title VII, Plaintiff's

claims of intentional discrimination and retaliation will be evaluated under the *McDonnell Douglas* "burden-

shifting framework." *See Miller*, 420 F.3d at 1114 (discrimination) (citing *McDonnell Douglas Corp. v.

Green*, 411 U.S. 792 (1973)); *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005)

(retaliation). The Tenth Circuit has explained the *McDonnell Douglas* analysis as follows:

> The plaintiff must carry the initial burden under the statute of establishing a prima facie case
> . . . . Once the plaintiff has established a prima facie case, the burden then must shift to the
> employer to articulate some legitimate . . . reason for its employment action. If the
> defendant makes this showing, the plaintiff must then show that defendant's justification is
> pretextual.

*Kendrick*, 220 F.3d at 1226 (internal quotation marks and citations omitted).

Each stage of the *McDonnell Douglas* analysis must be considered in turn. *Orr*, 417 F.3d at 1149;

*Horizon/CMS Healthcare*, 220 F.3d at 1193 ("[c]ollapsing the first and second stages of the *McDonnell

Douglas* analysis" would deny "a plaintiff the opportunity to demonstrate that the defendant's explanation

. . . is pretextual."). In any event, "[a] Title VII plaintiff must 'exhaust administrative remedies for each [allegedly unlawful] individual discriminatory or retaliatory act.'" *Duncan v. Manager, Dep't of Safety, City & County of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005) (quoting *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003)).

## IV.    Defendant's Motion for Summary Judgment.

Defendant moved for summary judgment arguing that Plaintiff failed to state a prima facie discrimination or retaliation claim and, in any event, did not make the requisite pretext showing under either Title VII cause of action. Plaintiff, conversely, maintained that a genuine issue of material fact remains regarding whether Defendant's proffered non-discriminatory and non-retaliatory justifications for its "adverse employment actions" are pretextual. Plaintiff's discrimination and retaliation claims are assessed in turn. *See infra* Part IV.A. (discrimination claim); Part IV.B. (retaliation claim).

### A.    Discrimination claim: Defendant's Motion for Summary Judgment will be denied.

#### 1.    Plaintiff stated a prima facie discrimination claim on three grounds.

To set forth a prima facie discrimination claim, a plaintiff must, by a preponderance of the evidence, establish: (1) membership in a protected class, (2) "adverse employment action", and (3) that "the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *See Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005) (internal quotation marks and citations omitted). "If the plaintiff establishes a prima facie case, a presumption of discrimination arises." *Jaramillo*, 427 F.3d at 1306.

It is well-established that Plaintiff's burden "in articulating a prima facie case is slight." *See id*. ("Because of the remedial nature of Title VII lawsuits, we broadly define adverse employment action."). More specifically, Plaintiff's burden "is one of production, not persuasion; it can involve no credibility

8

assessment." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000). To discharge her

prima facie showing, therefore, Plaintiff need only "raise an inference of discrimination, *not* dispel the

non-discriminatory reasons subsequently proffered by the defendant." *Horizon/CMS Healthcare Corp.*,

220 F.3d at 1193 (emphasis added); *E.E.O.C. v. Flasher Co. Inc.*, 986 F.2d 1312, 1318 (10th Cir.1992)

(prima facie showing satisfied by "small amount of proof necessary to create [an inference of

discrimination]"). *Accord Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (plaintiff's

burden at the prima facie stage is "not onerous").

### a.    Membership in protected class.

It is undisputed that Plaintiff, a Native American female, satisfied the first prima facie requirement:

she is a member of two classes protected under Title VII. (Compl. at 2-3.) Whether Plaintiff stated a prima

facie discrimination claim, therefore, turns on the second and third prongs of the analysis.

### b.    Adverse employment action.

Plaintiff maintained that the following disciplinary actions taken by Defendant against her each

constituted "adverse employment action": (1) the "unfavorable" performance rating (FY 1998); (2) being

placed on a PIP (July 1999); and (3) the suspension (December 1999). (Pl.'s Resp. at 7.) To be clear,

Plaintiff exhausted her administrative remedies as to each incident.[5] (Compl. Ex. (EEOC Denial of Request

---

[5]To the extent Plaintiff attempted to argue that either her non-selection for a GS-15 CEO Service Unit position in 2000 or being denied "leadership and context training courses" amounted to "adverse employment action," these claims are not well-taken. (Pl.'s Resp. at 8; Def.'s Mem. Mot. Summ. J. Ex. A at 3.) First, Plaintiff did not exhaust her administrative remedies related to the GS-15 position. *See Duncan*, 397 F.3d at 1314. Second, while Plaintiff exhausted her administrative remedies regarding the training issue (Compl. Ex. (EEOC Denial of Request for Reconsideration of 6/17/03, at 2)), she failed to include this allegation in the Complaint. (Compl. at 3-6 (no mention of Plaintiff being denied training or travel opportunities); IPTR at 1-5 (same).) *See, e.g., Cooper v. Waters*, No. 04-1383, 151 Fed. Appx. 638, 639 (10th Cir. Oct. 4, 2005) (unpublished) ("Although [plaintiff] mentioned these arguments in his summary-judgment pleadings filed in the district court, he did not present them in his complaint . . . [he] did not alert the district court that these allegations were intended for consideration as distinct claims for relief, rather than as supporting argument for the claims he had articulated."). *Accord Maldonado v. City of Altus*, 433 F.3d 1294, 1314 (10th Cir. 2006) (declining to address an argument raised by plaintiffs in their summary judgment response, which their pleadings did not reference).

for Reconsideration of 6/17/03).)  For the reasons stated below, it is clear that all three incidents amounted to "adverse employment action."  *See Orr*, 417 F.3d at 1151.

Turning first to the "unacceptable" performance evaluation and PIP, Defendant argued that neither incident amounted to "adverse employment action" because they were "not accompanied by a suspension, loss of pay or benefits."  (Def.'s Mem. Mot. Summ. J. at 15.)  Defendant's position, however, reads Tenth Circuit precedent too narrowly.  (*Id.*)  In the Tenth Circuit, "adverse employment action" is "liberally define[d]" and is "not simply limited to monetary losses in the form of wages or benefits."  *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998).  Moreover, the court of appeals requires a "case-by-case approach" to the "adverse employment action" analysis.  *Id.* ("the unique factors relevant to the situation at hand" must be individually assessed).

True, "*de minimus*" harm to an employee's "future employment prospects" does not constitute "adverse employment action."  *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004).  But an employee need only show that a particular unfavorable action would have "a likely effect on future job opportunities," *not* that the action was directly tied to not being selected for a particular position.[6]  *See id.* at 1029, 1035 (negative job references constituted "adverse employment action" where plaintiff evidenced that "her negative references seriously harm[ed] her ability to obtain [future] employment").  Indeed, in *Hillig*, the

---

[6]Therein, Defendant's reliance on *Stover v. Martinez*, 382 F.3d 1064, 1072 (10th Cir. 2004), for the proposition that the "unacceptable" rating does not constitute an "adverse employment action," is misplaced. (Def.'s Reply at 6.)  In *Stover*, the plaintiff premised her Title VII retaliation claim on her non-selection for "the position of Supervisory Attorney-Advisor."  *Stover*, 382 F.3d at 1072.  The Tenth Circuit noted that because "Stover did not apply for this competitively advertised position," she could not "assert that her employer retaliated against her *by* failing to hire, rehire, or promote her, that employee must have applied for the position she was denied."  *Id.*

Here, however, Plaintiff does not contend that her non-selection for the GS-15 position amounted to "adverse employment action."  (Pl.'s Resp. at 8.)  Plaintiff's reference to the GS-15 position, instead, simply goes to illustrate how the suspension, unfavorable evaluation, and PIP materially effected Plaintiff's future employment prospects.  (*Id.*)  In any event, there is no record evidence corroborating Plaintiff's position that Defendant's "adverse employment action" undermined her ability to compete for the GS-15 position.  *See infra* note 10.

Tenth Circuit emphasized that an "employer's conduct be *materially* adverse to the employee's job status," but need not necessarily "show the act precluded a *particular* employment prospect." *See id.* at 1033 (internal quotation marks and citations omitted) (emphasis added).

Importantly, Plaintiff contended "that the PIP and unacceptable rating remained in her file." (Pl.'s Resp. at 1.) The record, construed with all proper inferences in her favor, reflects support for Plaintiff's position. (Def.'s Mem. Mot. Summ. J. Ex. A4 at 1.)

First, Hubbard informed Plaintiff, at the conclusion of the PIP, that "[y]our performance rating for 1998 will *remain* as unacceptable." (*Id.* (emphasis added).) Second, even after Plaintiff completed the PIP, it clearly continued to be a benchmark for assessing Plaintiff's performance. For instance, Hubbard reminded Plaintiff that: "performance on [C]ritical [E]lement [#1], must remain acceptable through at least July 29, 2000, or additional action . . . can be taken without the requirement of placing you on another PIP." (*Id.* at 2.) The record, conversely, does not substantiate, in any regard, Defendant's uncorroborated claim that the PIP, and all references thereto, was expunged from Plaintiff's personnel file. (Def.'s Reply at 6 ("Plaintiff has no evidence that the 1999 rating or PIP still exist and have not been destroyed per normal practice (PIP files are destroyed after four years)"); *but cf.* Compl. Ex. (Letter from Hubbard to J. Vice (Eastern Agency Navajo Health Board)) (responding to Board's Resolution, alleging that "Navajo Area Office IHS management places more emphasis on balanced budget" than patient care, but attributing perceived problems to "management actions [which were] . . . *all internal to Crownpoint Service Unit*") (emphasis added).)

In any event, the fact that the basis for Plaintiff's unfavorable evaluation and PIP - i.e. "balancing the overall service unit financial resources" - embodies a key aspect of IHS CEOs' responsibilities further indicates that they constitute "adverse employment action." (Def.'s Mem. Mot. Summ. J. Ex. A1 at 2.)

Because achieving proper budget management is of "*paramount*" import in Plaintiff's position, it is reasonable to infer that the unacceptable rating and PIP could bear a "significant risk of humiliation, *damage to reputation*, and a concomitant harm to [Plaintiff's] *future employment prospects*." *See Hillig*, 381 F.3d at 1033 (internal quotation marks and citation omitted) (emphasis added).

Mindful that Plaintiff's burden in stating a prima facie claim is "slight," *Orr*, 417 F.3d at 1149, and that the Tenth Circuit gives great weight to each case's "unique factors," the unfavorable rating and PIP constituted "adverse employment action" that materially stained Plaintiff's personnel file, "likely effect[ing]" her "future job opportunities." *See Hillig*, 381 F.3d at 1033; *see also Medina*, 413 F.3d at 1137 ("Disciplinary proceedings, such as warning letters and reprimands, can constitute an adverse employment action.").

As to the suspension, the Tenth Circuit is clear that "[a]ctions such as suspensions . . . are by their nature adverse."[7] *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998). Clearly, Plaintiff's December 12-25, 1999 suspension constituted an "adverse employment action."

### c.   Inference of discrimination.

As noted *supra*, the third prong of Plaintiff's prima facie showing requires "a showing of circumstances giving rise to an inference of discrimination." *Sorbo v. United Parcel Service*, 432 F.3d 1169, 1173 (10th Cir. 2005); *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004) ("[Title VII] prohibits only intentional discrimination *based upon* an employee's protected class characteristics"). This may, but need not, be established by showing Defendant treated Plaintiff differently than a "similarly

---

[7]To be clear, giving Plaintiff the benefit of all reasonable inferences, Plaintiff's December 1999 suspension will be understood as a part of both her discrimination and retaliation claims. (*Compare* Pl.'s Resp. at 10 (Plaintiff argued December 1999 suspension amounted to unlawful Title VII discrimination), *with* Def.'s Mem. Mot. Summ. J. Ex. B (Plaintiff's Depo.) at 103:13-23 (Plaintiff answered "yes" in response to the following question: "you are claiming both race and sex discrimination for . . . the PIP and for the "unacceptable" [rating] . . . [and] retaliation for . . . the suspension; is that right?").)

situated" employee. *Sorbo*, 432 F.3d at 1173 ("such proof is just one sufficient means" to satisfy the third prima facie prong); *Plotke*, 405 F.3d at 1100 ("articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged"). Indeed, the "real question" in every disparate treatment discrimination case is:

> whether a plaintiff has shown "actions taken by the employer from which one can infer, if such actions, remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act."

*Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002) (quoting *McDonnell Douglas*, 438 U.S. at 576) (construing 42 U.S.C. § 1981); *see generally Maldonado v. City of Altus*, 433 F.3d 1294, 1307 (10th Cir. 2006) ("[I]n [disparate-treatment] discrimination suits, the elements of a plaintiff's case are the same . . . whether that case is brought under [42 U.S.C.] § 1981 . . . or Title VII.").

As to the FY 1998 "unacceptable" rating and PIP, Plaintiff presented evidence that Defendant treated her differently than "similarly situated" Gallup Service Unit C.E.O. Timothy Fleming, a white male. (IPTR at 4.) Namely, that even though Plaintiff and Fleming "received transfers" from the Navajo Area Office Reserve in FY 1998, only Plaintiff received an adverse FY 1998 evaluation. (*Id.*) Indeed, in Fleming's FY 1998 performance report, Hubbard made no mention that Fleming's Service Unit received reserve funds or that it reported a deficit (even including the non-recurring funds) for FY 1998. (Def.'s Mem. Mot. Summ. J. Ex. A5 (Fleming received "exceptional" ratings in all job performance areas, including "managerial responsibility" and "overall job performance").)

In the Tenth Circuit, "[i]ndividuals are considered 'similarly-situated' when they":

> (1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) [] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1277 (10th Cir. 2005). *Cf. Aramburu v. Boeing*

*Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (noting, in considering whether defendant discriminatorily approved employees' leave under a *seniority-based* scheme, that "similarly situated" employees must be "subject to the same standards governing performance evaluation and discipline") (emphasis added).

Here, the record reflects that Plaintiff's "comparison" to Fleming is "legally relevant." *Hysten*, 296 F.3d at 1182. Both Fleming and Plaintiff worked as CEOs of Navajo Area IHS Service Units and reported to the same direct supervisor: Hubbard. (Def.'s Mem. Mot. Summ. J. Ex. A5.) Moreover, both Plaintiff and Fleming included Navajo Area reserve funds in calculating the FY 1998 budgets for their respective Service Units. (IPTR at 4.) Accordingly, Plaintiff and Fleming were "sufficiently similar" to "support an inference of discrimination based on their different treatment." *See Hysten*, 296 F.3d at 1183.

Defendant's position that Fleming was not "similarly situated" - because Fleming, in contrast to Plaintiff, "was not a GS-level employee" and, therefore, was not evaluated under the same performance system (Def.'s Mem. Mot. Summ. J. Ex. A at 3) - is unpersuasive. It is uncontested that the "issue of balancing the overall service unit financial resources" was of "paramount" importance to Defendant. (Def.'s Mem. Mot. Summ. J. Ex. A2 at 1.) Moreover, even if Hubbard could not have responded to Plaintiff and Fleming's budget problems in an *identical* fashion, he certainly was not precluded from making reference to the issue in Fleming's evaluation. Because Fleming and Plaintiff were "similarly situated" and Hubbard treated them differently, the comparison readily supports an inference of discrimination as to the rating and PIP. (IPTR at 4.)

Turning to the suspension, it is clear that Plaintiff "demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Plotke*, 405 F.3d at 1100. As noted *supra* Part I, Defendant provided a two-part justification for the suspension, Plaintiff's: (1) time and attendance problems; and (2) transporting her son in a government-owned vehicle. As to the

former, Plaintiff conceded that she made frequent "changes/revisions" to her leave request, but maintained that she "did not fail to properly account for her time and attendance." (Pl.'s Resp. at 1-2.)  In any case, Plaintiff contended that, after Hubbard told her in November 1998 that her attendance record was unacceptable, she "complied with everything he indicated" (Def.'s Mem. Mot. Summ. J. Ex. B at 155:12-24), and questioned the true basis for Hubbard proposing she be suspended nine months later. (Pl.'s Resp. at 12.)

As to the second basis, Plaintiff admitted transporting her son in a government vehicle, but denied that he was an "unauthorized passenger." (*Id.*)  Plaintiff stated that her son, because he had a SF-50, was "considered a fellow federal employee." (*Id.*)  And, in any event, Plaintiff argued that, in transporting her son, she simply "followed policy of riding along in a government vehicle." (*Id.* (citing "Exhibit 1, Pltf. Dep. 68-69" but *failing to submit the same into evidence*).)  *See infra* text accompanying note 10.  Confusion regarding the status of Plaintiff's son, therefore, remains.

Most importantly, the fact that, on July 30, 1999, Hubbard formally proposed that Plaintiff be suspended for twenty-eight days, gave her an "unacceptable" rating for FY 1998, *and* placed her on a PIP, in itself, gives rise to an inference of discrimination. (Def.'s Mem. Mot. Summ. J. Ex. A2, Ex. A6.)  While, ultimately, Davis suspended Plaintiff for fourteen-days, the timing of Hubbard's proposal is material.  *See also infra* Part IV.A.3.  Taken togther, therefore, these circumstances amply support the conclusion that Defendant suspended Plaintiff under circumstances that give rise to an inference of unlawful discrimination. Accordingly, Plaintiff made a prima facie showing of gender- and race-based discrimination related to the suspension, "unacceptable" rating and PIP.  *Plotke*, 405 F.3d at 1100 (citing *McDonnell Douglas*, 411 U.S. at 802 n.13) (recognizing that "a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged."); *Hysten*, 296 F.3d at 1181 ("courts must

be sensitive to the *myriad of ways* such an inference can be created") (emphasis added).

> **2.    Defendant articulated non-discriminatory reasons for all three "adverse employment actions."**

Defendant satisfied its burden at the second stage of the *McDonnell Douglas* analysis by stating legitimate, non-discriminatory explanations for the three underlying "adverse employment actions." *Plotke*, 405 F.3d at 1099.  As to the "unacceptable" rating and PIP for FY 1998, Defendant explained that "Plaintiff had not performed adequately with respect to Critical Element [#]1 . . . for the second year in a row she was not balancing her budget without receiving additional funds from the Area Office."  (Def.'s Mem. Mot. Summ. J. at 10, Ex. A ¶6.)

Defendant contended that Plaintiff was suspended because she failed to "properly account for [her] time and attendance" and unlawfully "misuse[d] [a] government vehicle."  (Def.'s Reply at 9, 11.) Additionally, stated Defendant, Plaintiff's "attitude and behavior towards balancing the budget and keeping the Area Office informed of her efforts to do so led to the rating and the PIP."  (Def.'s Mem. Mot. Summ. J. at 11, Ex. A ¶¶6-7.)  Defendant further justified its disparate treatment of Plaintiff and Fleming by stating that: (1) Fleming - a Commissioned Officer, not a Civil Service employee - was not evaluated under the same evaluation scheme as Plaintiff; (2) in July 1999, Plaintiff  projected "a deficit for the second year in a row" for FY 1999, while Fleming did not; and (3) Fleming, unlike Plaintiff, "worked hard to eliminate the deficit."  (Def.'s Mem. Mot. Summ. J. Ex. A ¶¶8, 12-17.)

These facially non-discriminatory rationales are sufficient to "shift the burden to [Plaintiff] to show that there is a genuine issue of material fact whether [Defendant's] proffered reasons" for the three "adverse employment actions" are pretextual.  *See Plotke*, 405 F.3d at 1102.

###### 3.   Pretext: Plaintiff made the requisite showing that Defendant's rationales for each "adverse employment action"are pretextual.

Plaintiff, to survive Defendant's motion, must show a genuine dispute of material fact remains regarding whether Defendant's proffered reasons for the "adverse employment actions" are "pretextual-i.e. unworthy of belief." *See Annett v. Univ. of Kansas*, 371 F.3d 1233, 1240 (10th Cir. 2004) (internal quotation marks and citations omitted). Pretext can be demonstrated by:

> revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could *rationally find them unworthy of credence* . . .

*Plotke*, 405 F.3d at 1102 (internal quotation marks and citations omitted) (emphasis added).

Evidence in "a variety of forms" can be relied on in "attempt[ing] to establish that [a defendant's] stated reasons are pretextual." *See id.* Notably, "[i]n certain cases, a plaintiff's prima facie case and the inferences that may be drawn therefrom *themselves cast sufficient doubt* on a defendant's nondiscriminatory reason to satisfy his burden of showing pretext." *English v. Colorado Dep't. of Corr.*, 248 F.3d 1002, 1009 (10th Cir. 2001) (emphasis added).

Regarding the unfavorable rating and PIP, Plaintiff apparently relied on the strength of her prima facie showing to demonstrate pretext.[8] Defendant's disparate treatment of Plaintiff and Fleming, however, contributes greatly to Plaintiff's pretext showing. *See English*, 248 F.3d at 1009. It is clear that Plaintiff can demonstrate pretext "by providing evidence that [s]he was treated differently from . . . [a] similarly-situated employee[] who violated work rules of comparable seriousness." *See Plotke*, 405 F.3d at 1102. Plaintiff evidenced that Defendant's disparate treatment of "similarly situated" Gallup Service Unit CEO Fleming gave rise to a strong inference of discrimination. *See supra* Part IV.A.1. Thus, it is clearly

---

[8]Plaintiff's Response did not specifically address why Defendant's rationale regarding the "unacceptable" rating and PIP constituted pretext. (Pl's Resp. *passim*.)

relevant that Fleming: (1) received reserve funds in FY 1998; (2) even including those non-recurring funds had "a deficit for his Service Unit" in FY 1998 (Def.'s Reply Ex. D at 3); and (3) received, nevertheless, a glowing performance evaluation for FY 1998 from Hubbard . (Def.'s Mem. Mot. Summ. J. Ex. A5.) This contributes greatly to Plaintiff's pretext showing. *See Plotke*, 405 F.3d at 1102.

Moreover, Defendant's rationales for the different treatment are unsatisfying. (Def.'s Mem. Mot. Summ. J. Ex. A at 2-4 (Plaintiff projected "a deficit for the second year in a row" and "did not engage in proactive steps to balance her budget").) That is, Defendant's explanations, for why Hubbard gave Plaintiff and Fleming such conspicuously dissimilar FY 1998 reviews, do not account for why Hubbard made *no mention at all* of either Fleming's receipt of reserve funds or that his Service Unit carried a deficit in Fleming's FY 1998 evaluation completed in July 1999. (*Id.*)

In any event, the fact that Hubbard's bases for taking "adverse employment action" against Plaintiff were, at least partially, subjective is material. *See Plotke*, 405 F.3d at 1106 (quoting *Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981): "although subjective criteria [are] not wrongful *per se*, 'obviously subjective decision making provides an opportunity for unlawful discrimination.'"). It is well-established that "[c]ourts view with skepticism the use of subjective evaluations" in making materially adverse personnel decisions.[9] *See id*.

To this end, it is material that, despite conceding that it "periodically" provides "additional [Area

---

[9]As the Tenth Circuit recently explained:
[t]he inference of pretext in this context is based on the idea that a decision-maker could cloak his bias in an unassailable subjective judgment. Thus, when a subjective decision is made by someone whose motives have been put in question in the case, an inference of pretext may be appropriate.
*Platero vs. Williams Field Servs. Co.*, No. 05-2006, 2006 WL 864851 (10th Cir. Apr. 5, 2006) (unpublished) (citations omitted) (emphasis in original). *Cf. Jones v. Barnhart*, 349 F.3d 1260, 1267-68 (10th Cir. 2003) ("we typically infer pretext in ["score-dominated" assessment systems] only when the criteria on which the employers ultimately rely are entirely subjective in nature.").

Office Reserve] funds to Service Units" (Def.'s Mem. Mot. Summ. J. Ex. A ¶7), Defendant justified Hubbard's different treatment of Plaintiff and Fleming by citing Plaintiff's "demonstrated lack of urgency and attention to budgets." (*Id.*) If a jury found this subjective rationale for Hubbard's rating and PIP "unworthy of credence," it could reasonably infer that the real reason Plaintiff received the unfavorable rating and PIP was Hubbard's discriminatory animus. *See Plotke*, 405 F.3d at 1104; *id*. at 1102-03 (pretext showing satisfied where plaintiff's evidence "allow[ed] for an inference that the employer's proffered non-discriminatory reasons were either a post hoc fabrication or otherwise did *not actually motivate the employment action*") (internal quotation marks and citations omitted) (emphasis added).

As to the suspension, Plaintiff made several arguments backing her position that were uncorroborated by record evidence.[10] *See Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1177 (10th Cir. 2000); *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings."). Nevertheless, Plaintiff's "prima facie case and the inferences that may be drawn therefrom *themselves* cast sufficient doubt" on Defendant's facially proper explanation to meet her pretext burden.[11] *See English*, 248 F.3d at 1009 (emphasis added).

---

[10]Namely, Plaintiff argued that: (1) the IAB audit "was performed with ignorance of the Navajo [IHS] practices" and that the "auditing process resulted in a severe disheveling of Plaintiff's timekeepers' records"; (2) "the behavior [Hubbard] alleged in July 1999 had already been immediately corrected by Plaintiff in May 1996, without any further indication . . . that it remained an issue." (Pl.'s Resp. at 11-12 (citing deposition testimony not attached).) Also, Plaintiff contended that she had not acted improperly in transporting her son in the government vehicle: (1) her son held an "official SF-50 and was therefore considered a . . . federal employee"; (2) Crownpoint had a "long standing common practice for government employees to ride along with fellow employees going in the same direction" and, therein, "Plaintiff was suspended . . . without warning or intermediate steps to correct the issue"; (3) Plaintiff had notified Hubbard of this "long standing common practice at Crownpoint" prior to the suspension; that (4) Plaintiff was not "afforded some level of progressive discipline" despite her "exemplary record," "high level position, and the relatively minor allegations." (*Id.*)

[11]To be clear, as to the suspension, the fact that Davis - rather than Hubbard - undertook the "adverse employment action" does not undermine this conclusion: "[D]efendant may be held liable for a subordinate employee's prejudice even if the manager lacked discriminatory intent." *See English*, 248 F.3d at 1011. Moreover, Davis suspended Plaintiff for the same exact grounds as those proposed by Hubbard. (Def.'s Mem. Mot. Summ. J. Ex. A12.)

First, Plaintiff conceded that she made frequent "changes/revisions" to her leave request, but questioned Hubbard's objections because "[s]taff do it all the time, *especially supervisors*." (Def.'s Mem. Mot. Summ. J. Ex. A8 (emphasis added).)  Moreover, she maintained that, although Hubbard told her that she was not "singled out" in scrutinizing her time and attendance records, Plaintiff's "second-line" supervisor indicated that she "was the only employee that Area was having trouble with" regarding record keeping. (*Id*. at 2.)  This type of inconsistency is also probative of pretext. *See Plotke*, 405 F.3d at 1102.

Second, it is undisputed that Plaintiff had the vehicle for "official government business on April 27 and April 28, 1999. (Def.'s Mem. Summ. J. A6 at 3.)  It is also clear that Plaintiff was authorized to take "the car to [her] residence" the evening of April 26 "so that [she] could leave for [her] official business directly from [her] home the next morning." (*Id*.)  Similarly, having completed her travel April 28, Plaintiff drove the vehicle from her residence to the Service Unit the morning of April 29. (*See id*.)  Plaintiff admitted transporting her son in the government vehicle the evening of April 26 and the morning of April 29 to and from her residence. (*Id*.)

Yet, the parties emphatically dispute whether Plaintiff's son was an "unauthorized passenger." *See also supra* Part IV.A.1.  Defendant argued that, regardless of whether Plaintiff's son was a "volunteer or an employee," he was "an unauthorized passenger" as prescribed by 31 U.S.C. §§ 1344(a)(1) and (e)(1), 1349(b) and 45 C.F.R. § 73.735-304. (Def.'s Reply at 11; Def.'s Mem. Mot. Summ. J. Ex. A6 at 3.)  But Defendant's bare citation to broad statutory and regulatory provisions that afford decision-makers deference, accompanied only by conclusory statements, does not resolve the matter. *See, e.g.*, 45 C.F.R. § 73.735-304 (2006) ("Use of a Government owned . . . vehicle . . . for non-official purposes *may* result in suspension for at least 30 days or removal from the Federal service.") (emphasis added).  Thus, a genuine issue of fact remains whether Plaintiff's son was an "unauthorized" passenger on the dates in question and,

in any event, whether Defendant's "proffered non-discriminatory reasons" for the "adverse employment actions" were pretextual.  *See Plotke*, 405 F.3d at 1102-03.

Moreover, Plaintiff's pretext showing regarding the suspension is bolstered when the "adverse employment action" is viewed contextually, through a wider lens.  *See id.* at 1105 ("[o]n a motion for summary judgment, the district court is required to review the record taken *as a whole*") (emphasis added). First, considering Plaintiff's long career as a high-ranking supervisor, it is hard to believe that Defendant would normally suspend a supervisor for transporting her son from the Service Unit to their residence. (Def.'s Mem. Mot. Summ. J. Ex. A6 at 4 (noting that Plaintiff had received roughly "ten different performance awards during" her tenure).) Defendant's position is even more peculiar given the very remote and rural nature of the Crownpoint, New Mexico area.  *See Plotke*, 405 F.3d at 1102 ("weaknesses" and "implausibilities" may evidence pretext).

Second, the viability of Plaintiff's suspension claim is shored up by the fact that, as discussed *supra* Part IV.A.1., the *same day* Hubbard recommended Plaintiff's suspension, he also gave Plaintiff the "unacceptable" rating and PIP.  The materiality of this timing is further underscored by Plaintiff's persuasive pretext showing regarding the rating and PIP: Hubbard treated Fleming - a "similarly situated" white male - markedly differently than Plaintiff.  To the extent Hubbard's alleged discriminatory animus precipitated the rating and PIP, this provides a sound basis for inferring the stain of Hubbard's discrimination extends to Plaintiff's suspension, as well.  *See Plotke*, 405 F.3d at 1105 (finding "[t]he *timing and sequence* of events leading up to [Plaintiff's] firing . . . [to be] evidence of pretext) (emphasis added).

Viewing the record in the light most favorable to Plaintiff, therefore, the circumstances surrounding Hubbard's proposed suspension, which Davis implemented, contains sufficient evidence "to raise a genuine doubt about [Defendant's] motivation . . . ."  *See id.* at 1105.  Hence, Defendant's motion as to Plaintiff's

discrimination claim will be, accordingly, denied as to all three "adverse employment actions." *See id.* at 1102 ("So long as the plaintiff has presented evidence of pretext . . . the case should go to trial.").

**B.      Retaliation Claim: Defendant's Motion for Summary Judgment will be granted.**

As noted *supra*, Defendant also moved for summary judgment on Plaintiff's retaliation claim. A prima facie Title VII retaliation claim is established where a plaintiff shows that: "'(1) [s]he engaged in protected opposition to discrimination; (2) [s]he was subject to adverse employment action; and (3) that there exists a causal connection between the protected activity and the adverse action.'" *Maldonado*, 433 F.3d at 1308-09 (quoting *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1103 (10th Cir. 1998)).  It is undisputed that Plaintiff engaged in protected EEO activity when she filed an EEO Complaint in 1996. (IPTR at 2.)

Moreover, Hubbard "knew [Plaintiff] had been involved in prior EEO activity" on July 30, 1999. (Def.'s Mem. Mot. Summ. J. Ex. A at 6).  Less clear, however, is when Hubbard first became aware of either the 1996 EEO Complaint Plaintiff filed against him or the 1997 Final Agency Decision dismissing the same. *See Hysten*, 296 F.3d at 1184 ("the alleged retaliatory act is meaningless unless those who caused the alleged retaliatory act to occur are shown to have been aware of the specific activity"); *see generally O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1258 (10th Cir. 2001) ("Both Title VII and § 1981 support a cause of action for retaliation and require a plaintiff to establish the same prima facie elements to recover.").

The second-prong of Plaintiff's prima facie case is also evidenced: Plaintiff's suspension, unfavorable FY 1998 rating, and PIP each amounted to "adverse employment action" by Defendant. *See supra* Part IV.A.1.  Hence, the only issue remaining at the prima facie stage is whether a causal connection existed between Plaintiff's protected activity and retaliatory conduct.

Plaintiff "may establish the causal connection by proffering evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Annett*, 371 F.3d at 1239 (internal quotation marks and citation omitted). But "[u]nless the [retaliatory action] is *very closely connected in time* to the protected conduct, [P]laintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation." *See Conner v. Schnuck Markets, Inc.*,121 F.3d 1390, 1395 (10th Cir. 1997) (emphasis added). Thus, the date of Hubbard's allegedly retaliatory conduct "is key to this inquiry because the closer it occurred to the protected activity, the more likely it will support a showing of causation." *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

Defendant issued a Final Agency Decision rejecting Plaintiff's 1996 EEO Complaint on May 16, 1997. (IPTR at 2.) Plaintiff argued that, in fall 1997, Hubbard initiated a retaliatory campaign against her, which culminated in Defendant taking "adverse employment action" against her. (Pl.'s Resp. at 11, 15 (averring, *inter alia*, but without providing record evidence, that Hubbard "directed the removal of Plaintiff's time and attendance records from her work site" and that this "disheveled" her files).) Specifically, Plaintiff alleged that Hubbard requested that the IAB audit her time and attendance records in retaliation for her EEO activity. (*See id*.) As established *supra* Part I, the parties dispute when Hubbard requested the IAB audit. (*Compare id*. at 2 (audit "began immediately subsequent to [Plaintiff's] protected activity in 1996/1997"), *with* Def.'s Mem. Mot. Summ. J. at A6 at 1 (Hubbard stated that "[e]arly in 1998, [he] began to have concerns about [Plaintiff's] use of leave" and that "[a]s a result of these concerns, [he] asked . . . IAB to audit [Plaintiff's] time and attendance . . .").)

Notably, however, Plaintiff's claims are simply bare allegations, uncorroborated by any record evidence. Consequently, the earliest date that the record indicates that Hubbard was aware of Plaintiff's allegedly irregular leave practices was "[e]arly in 1998." (Def.'s Mem. Mot. Summ. J. Ex. A6 at 1.) Even

assuming *arguendo* that requesting an audit could ever constitute "adverse employment action," and also that Hubbard was aware of the 1997 Final Agency decision by early 1998, there was a *six month* time lag between May 16, 1997 - again, the date that the Final Agency Decision related to Plaintiff's 1996 EEO Complaint issued - and Hubbard's allegedly retaliatory conduct in early 1998.

The Tenth Circuit is clear that a six month lag between Plaintiff's protected activity and Hubbard's alleged retaliatory action is simply too lengthy to support the requisite "causal connection" required for a prima facie case of Title VII retaliation.[12] *Compare, e.g.*, *Connor*, 121 F.3d at 1395 (four-month delay insufficient "to justify an inference of causation"), *Hysten*, 296 F.3d at 1183-84 (three-month lag, by itself, not sufficient for causal connection), *and Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997) (same), *with, e.g.*, *Annett*, 371 F.3d at 1240-41 (two- to three-month lag sufficient for causal connection), *and Anderson*, 181 F.3d at 1179 (two months and one week assumed to be sufficient for causal connection). Additionally, Plaintiff failed "to provide sufficient direct or indirect evidence to support such a connection." *See Stover v. Martinez*, 382 F.3d 1064, 1074 (10th Cir. 2004); *see supra* (noting Plaintiff's failure to submit exhibits cited in her motion papers). "Having examined [the record] in its totality," the "proximity between [Plaintiff's 1996 EEO activity] and the challenged employment consequence" does not "permit[] an inference of causation." *Hysten*, 296 F.3d at 1184.

Finally, Plaintiff's 1999 EEO Complaint, which underlies the instant action, bears brief mention. (Pl.'s Resp. at 4, 14.) Less than three months elapsed between the time Plaintiff filed her October 22, 1999 EEO Complaint and Davis imposed Hubbard's proposed suspension on December 7, 1999. *Cf. Annett*, 371 F.3d at 1240-41 (two- to three-month lag sufficient for causal connection). Notably, however, Plaintiff

---

[12]Clearly, therefore, the three "adverse employment actions" recognized herein, *see supra* Part IV.A.1., could not support the requisite "causal connection": the rating, PIP and suspension each arose in 1999, more than *two years* following the May 1997 Final Agency Decision. *See Connor*, 121 F.3d at 1395.

failed to argue, or evidence in any regard, that *Davis* acted retaliatorily in imposing the December 1999 suspension.  (Pl.'s Resp. at 15.)

To the contrary, Plaintiff consistently maintained that "Hubbard effectuated the proposed suspension" and that Davis simply: (1) "implement[ed] the suspension"; and, therefore (2) Davis' "reduction in [the] suspension period is immaterial for these purposes."  (*Id.*; *see also* Def.'s Mem. Mot. Summ. J. Ex. A12 (Davis suspended Plaintiff for the same grounds as those proposed by Hubbard, but for a *lesser*, fourteen day period); Def.'s Mem. Mot. Summ. J. at Ex. B (Plaintiff Depo.) at 155:7-9 ("I'm claiming that Mr. Hubbard, who ordered the audit, is the one who had retaliatory actions against me.").)  Indeed, the record contains not a single allegation that Plaintiff's October 1999 protected activity precipitated her December 1999 suspension.  *Gunnell*, 152 F.3d at 1263 ("A plaintiff asserting a retaliation claim has the ultimate burden of persuasion to demonstrate that the challenged employment decision was the result of intentional retaliation.") (internal quotation marks and citation omitted).  Accordingly, Plaintiff's 1999 EEO Complaint cannot save Plaintiff's retaliation theory either.

Because Plaintiff failed to state a prima facie claim of retaliation, Defendant's summary judgment motion will be granted as to her Title VII retaliation claim.[13]  *See Horizon/CMS Healthcare Corp.*, 220 F.3d at 1190.

## V.    Conclusion.

For the foregoing reasons, Defendant's Motion for Summary Judgment is **denied** as to Plaintiff's

---

[13]In any event, Defendant's motion should be granted because Plaintiff cannot make the requisite pretext showing on the record here, while "close temporal proximity is a factor in showing pretext, [it] is not alone sufficient to defeat summary judgment."  *Medina*, 413 F.3d at 1138 (internal quotation marks and citation omitted) ("No reasonable jury could conclude that a *five-week span of time* between [plaintiff's] complaint . . . and her subsequent failure to be promoted, without more, meets this standard [for pretext].") (emphasis added).

discrimination claim, but **granted** as to her retaliation claim.  *See Munoz*, 221 F.3d at 1164 (quoting FED. R. CIV. P. 56(c)).

        **IT IS SO ORDERED**.

_____

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**

26